1    SEAN C. CUNNINGHAM (Bar No. 174931)
     sean.cunningham@dlapiper.com
2    BRENT K. YAMASHITA (Bar No. 206890)
     brent.yamashita@dlapiper.com
3    BRIAN M. FOGARTY (Bar No. 218792)
     brian.fogarty@dlapiper.com
4    ERIN P. GIBSON (Bar No. 229305)
     erin.gibson@dlapiper.com
5    ROBERT BUERGI (Bar No. 242910)
     robert.buergi@dlapiper.com
6    ROBERT WILLIAMS (Bar No. 246990)
     robert.williams@dlapiper.com
7    DLA PIPER LLP (US)
     401 B Street, Suite 1700
8    San Diego, CA  92101-4297
     Tel:  619.699.2700
9    Fax:  619.699.2701

10   Attorneys for PLAINTIFF
     OVERLAND STORAGE, INC.
11

12              UNITED STATES DISTRICT COURT

13              SOUTHERN DISTRICT OF CALIFORNIA

14

15   OVERLAND STORAGE, INC.,

16        Plaintiff,                    Case No. 10 CV 1700   JLS BLM

17        v.                           PLAINTIFF OVERLAND STORAGE,
                                        INC.'S COMPLAINT FOR PATENT
18   BDT AG (GERMANY),                 INFRINGEMENT
     BDT PRODUCTS, INC.,
19   BDT-SOLUTIONS GMBH (GERMANY),

20        Defendants.

21

22

23

24

25

26

27

28

Plaintiff Overland Storage, Inc., by and through its undersigned attorneys, complains and alleges against Defendants BDT AG, BDT Products, Inc. and BDT-Solutions GmbH (collectively "Defendants") as follows:

### NATURE OF THE ACTION

1.      This is a civil action for infringement of United States Patent Nos. 6,328,766 and 6,353,581.  This action arises under the laws of the United States relating to patents, including 35 U.S.C. § 281.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) and pursuant to the patent laws of the United States of America, 35 U.S.C. § 101 *et seq.*

3.      Venue properly lies within the Southern District of California pursuant to the provisions of 28 U.S.C. §§ 1391(b), (c), and (d) and 1400(b).  On information and belief, each Defendant conducts substantial business directly and/or through third parties or agents in this judicial district by at least selling and/or offering to sell the infringing products, including media libraries and systems, and/or by conducting other business in this judicial district.  Furthermore, Plaintiff Overland Storage is headquartered and has its principal place of business in this district, sells competing media libraries and systems in this district, and has been harmed by Defendants' conduct, business transactions and sales in this district.

4.      This Court has personal jurisdiction over each Defendant because, on information and belief, each Defendant transacts continuous and systematic business within the State of California and the Southern District of California.  In addition, this Court has personal jurisdiction over each Defendant because, on information and belief, this lawsuit arises out of each Defendant's infringing activities including without limitation each Defendant's making, using, selling and/or offering to sell infringing products in the State of California and the

Southern District of California.  Finally, this Court has personal jurisdiction over each Defendant because, on information and belief, each Defendant has made, used, sold and/or offered for sale its infringing products and placed such infringing products in the stream of interstate commerce with the expectation that such infringing products would be made, used, sold and/or offered for sale within the State of California and the Southern District of California.

## THE PARTIES

5.      Plaintiff Overland Storage, Inc. ("Overland Storage") is a California corporation with its headquarters and principal place of business at 9112 Spectrum Center Boulevard, San Diego, California 92123.

6.      On information and belief, Defendant BDT AG is a corporation incorporated under the laws of Germany with its headquarters and principal place of business located at Saline 29, 78628 Rottweil, Germany.  On information and belief, BDT AG is an affiliate of BDT-Solutions GmbH and a parent company of BDT Products, Inc.

7.      On information and belief, Defendant BDT Products, Inc. ("BDT Products") is a corporation organized and existing under the laws of California, having a principal place of business at 17222 Armstrong Avenue, Irvine, California 92614.  On information and belief, BDT Products is a subsidiary of BDT AG and an affiliate of BDT-Solutions GmbH.

8.      On information and belief, Defendant BDT-Solutions GmbH ("BDT-Solutions") is a limited liability corporation incorporated under the laws of Germany with its headquarters and principal place of business located at Saline 29, 78628 Rottweil, Germany.  On information and belief, BDT-Solutions is an affiliate of BDT AG and BDT Products, Inc.

## THE ASSERTED PATENTS

9.      On December 11, 2001, United States Patent No. 6,328,766 ("the '766 patent"), entitled "Media Element Library with Non-Overlapping Subset of Media Elements and Non-

Overlapping Subset of Media Element Drives Accessible to First Host and Unaccessible to Second Host," was duly and legally issued by the United States Patent and Trademark Office. The named inventor is Robert M. Long.  Overland Storage is the assignee and owner of the entire right, title and interest in and to the '766 patent and has the right to bring this suit for damages and other relief.  A true and correct copy of the '766 patent is attached as Exhibit A.

10.    The '766 patent discloses an automated media library containing media elements, where each media element may be a member of one of a plurality of sets of media elements.  The patent also discloses methods where host computers can store and retrieve data to and from separate portions of the media library without interfering with one another.

11.    On March 5, 2002, United States Patent No. 6,353,581 ("the '581 patent"), entitled "Media Access in a Media Library," was duly and legally issued by the United States Patent and Trademark Office.  The named inventor is Karl B. Offerman.   Overland Storage is the assignee and owner of the entire right, title and interest in and to the '581 patent and has the right to bring this suit for damages and other relief.  A true and correct copy of the '581 patent is attached as Exhibit B.

12.    The '581 patent discloses an automated media library and retrieval system where a user can insert or remove storage media, such as magnetic tape cartridges, via a mail slot without removing a magazine of storage media from the media library and without disturbing other media library operations.  The patent also discloses methods of moving a particular storage medium contained in the media library from a readable location to a manually accessible location.

## BACKGROUND

13.    A company's data is one of its most critical assets.  Businesses must retain data for extended periods of time to comply with regulatory requirements, conduct internal audits, and ensure best practices.  Keeping data stored, accessible, and secure has become increasingly

-4-

complex and expensive as companies are faced with massive data growth, increasingly stringent regulatory requirements and distributed environments that can range from across the hall to across the globe.  As companies' data storage needs have increased from megabytes to gigabytes to terabytes, automated media libraries have become vital.  Automated media libraries allow users to store digital data in a central location, then search for and retrieve that data from networked computers when necessary.  This data can be stored on a variety of storage media within the library, including disks or magnetic tapes.

14.    Compact, high capacity, low-cost data management systems are common today among businesses, but it was not always that way.  Prior data management solutions required cabinet and even room-sized systems, and often could be connected to only a single host computer at any given time.  Also, prior data management solutions often imposed unacceptably long periods of downtime in cases where individual files and directories needed to be quickly restored.  These cumbersome, expensive and inefficient systems were being outpaced by the high performance data storage demands of businesses.

15.    Overland Storage's patented data management and data protection solutions addressed these challenges.  These patented technologies encompass both the apparatus that houses the media library and the methods of storing and retrieving that data from host computers.  Using Overland Storage's technologies, customers can create network-based, virtual media libraries to maintain data for continuous local backup and remote disaster recovery, or to store data for long-term archiving and compliance requirements.  The result is that these cutting-edge products provide a more cost-effective way of keeping customers' data stored, accessible and secure.

16.    Overland Storage has been granted a number of patents relating to its innovative data management and protection systems.  In the 1990s, Overland Storage marketed the first

1  scalable automated media library solution that eliminated the physical limitations of conventional

2  tape library designs.  Overland Storage has continued to improve on its media library technology

3  and has marketed product line families including but not limited to its SnapServer, Ultimus

4  RAID, ARCvault, NEO Series Tape Libraries, and REO Series Virtual Tape Libraries.

5

6          17.     Following Overland Storage's introduction of its patent-protected media libraries

7  into the market, Defendants began making and selling similar product lines of media libraries,

8  each of which use Overland Storage's patented technology.

9          18.     On information and belief, each of the Defendants has made, used, sold, offered

10  for sale and/or imported media libraries, products and/or components that practice the claims of

11  the '766 and '581 patents, as set forth more fully below.

12                                          **COUNT ONE**

13

14              **Infringement of the '766 Patent by Defendants**

15          19.     Overland Storage incorporates by reference each of the allegations set forth above.

16          20.     On information and belief, Defendants, without authority, have directly infringed

17  and continue to directly infringe, under 35 U.S.C. § 271(a), the '766 patent at least by importing,

18  selling, offering for sale and/or using within the United States the infringing products, including

19  but not limited to the Flexstor II tape library series.  By way of example and not limitation, the

20  Defendants' Flexstor II tape library series, alone and/or in combination with other products,

21  practice each of the limitations of at least independent claim 1 of the '766 patent.

22

23          21.     On information and belief, Defendants, without authority, have actively induced

24  and continue to actively induce infringement by others, under 35 U.S.C. § 271(b), by intentionally

25  causing others to directly infringe the '766 patent and/or by intentionally instructing others how

26  to use the infringing products.

27

28

22.     On information and belief, Defendants, without authority, have contributorily infringed and continue to contributorily infringe, under 35 U.S.C. § 271(c), by importing into the United States, selling and/or offering to sell within the United States infringing products that (1) constitute a material part of the invention of the '766 patent, (2) Defendants know to be especially adapted for use in infringing the '766 patent, and (3) are not staple articles of commerce suitable for substantial noninfringing use with respect to the '766 patent.

23.     Defendants had actual notice of infringement of the '766 patent before the filing of this complaint.  The filing of this complaint also constitutes notice to Defendants of the '766 patent under 35 U.S.C. § 287.

24.     As a result of the infringement of the '766 patent by Defendants, Overland Storage has suffered and will continue to suffer damages in an amount to be proven at trial.

25.     Overland Storage has been irreparably harmed by these acts of infringement and will continue to be harmed unless Defendants' further acts of infringement are restrained and enjoined by order of this Court.  Overland Storage has no adequate remedy at law.

## COUNT TWO

### Infringement of the '581 Patent by Defendants

26.     Overland Storage incorporates by reference each of the allegations set forth above.

27.     On information and belief, Defendants, without authority, have directly infringed and continue to directly infringe, under 35 U.S.C. § 271(a), the '581 patent at least by importing, selling, offering for sale and/or using within the United States the infringing products, including but not limited to the Flexstor II tape library series.  By way of example and not limitation, the Defendants' Flexstor II tape library series, alone and/or in combination with other products, practice each of the limitations of at least independent claim 10 of the '581 patent.

DLA PIPER LLP (US)
SAN DIEGO

WEST\22131935.1

-7-

CASE NO. _____
COMPLAINT FOR PATENT INFRINGEMENT

28.     On information and belief, Defendants, without authority, have actively induced and continue to actively induce infringement by others, under 35 U.S.C. § 271(b), by intentionally causing others to directly infringe the '581 patent and/or by intentionally instructing others how to use the infringing products.

29.     On information and belief, Defendants, without authority, have contributorily infringed and continue to contributorily infringe, under 35 U.S.C. § 271(c), by importing into the United States, selling and/or offering to sell within the United States infringing products that (1) constitute a material part of the invention of the '581 patent, (2) Defendants know to be especially adapted for use in infringing the '581 patent, and (3) are not staple articles of commerce suitable for substantial non-infringing use with respect to the '581 patent.

30.     Defendants had actual notice of infringement of the '581 patent before the filing of this complaint.  The filing of this complaint also constitutes notice to Defendants of the '581 patent under 35 U.S.C. § 287.

31.     As a result of the infringement of the '581 patent by Defendants, Overland Storage has suffered and will continue to suffer damages in an amount to be proven at trial.

32.     Overland Storage has been irreparably harmed by these acts of infringement and will continue to be harmed unless Defendants' further acts of infringement are restrained and enjoined by order of this Court.  Overland Storage has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Overland Storage prays for judgment:

1.     That Overland Storage be adjudged the owner of the '766 and '581 patents and entitled to all rights of recovery thereunder, and that the '766 and '581 patents are valid and enforceable;

2.      That Defendants be adjudged to have directly infringed, induced infringement and contributed to infringement of the '766 and '581 patents;

3.      That Defendants and their officers, principals, agents, attorneys, servants, employees and all others in active concert or participation with them, and their successors and assigns, be enjoined by preliminary and permanent injunction from infringement, inducement of infringement, and contributory infringement of the '766 and '581 patents, including but not limited to making, using, importing, offering to sell and selling the infringing products;

4.      That Overland Storage be awarded damages under 35 U.S.C. § 284, adequate to compensate it for Defendants' infringement of the '766 and '581 patents in an amount to be proven at trial, together with interest and costs as fixed by the Court;

5.      That this case be declared an exceptional case within the meaning of 35 U.S.C. § 285 and that Overland Storage be awarded the attorneys' fees, costs, and expenses that it incurs prosecuting this action;

6.      That Overland Storage be awarded prejudgment interest; and

7.      For such other and further equitable relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Overland Storage demands a trial by jury for all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

/////

/////

/////

/////

/////

/////

DLA PIPER LLP (US)
SAN DIEGO

WEST\22131935.1

CASE NO. _____
COMPLAINT FOR PATENT INFRINGEMENT

1   Dated:  August 13, 2010

2                                          DLA PIPER LLP (US)

3                                          By _____

4                                             SEAN C. CUNNINGHAM
                                               BRENT K. YAMASHITA
                                               BRIAN M. FOGARTY
5                                             ERIN P. GIBSON
                                               ROBERT BUERGI
                                               ROBERT WILLIAMS
6                                             DLA PIPER LLP (US)
                                               401 B Street, Suite 1700
7                                             San Diego, CA 92101-4297
                                               (619) 699-2700 (Phone)
8                                             (619) 699-2701 (Facsimile)
                                               Attorneys for PLAINTIFF OVERLAND
9                                             STORAGE, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER LLP (US)
   SAN DIEGO            WEST\22131935.1

-10-

CASE NO. _____
COMPLAINT FOR PATENT INFRINGEMENT

# TABLE OF CONTENTS FOR EXHIBITS

| EXHIBIT | DESCRIPTION | PAGES |
|---------|------------|-------|
| A | A copy of United States Patent No. 6,328,766 | 11-26 |
| B | A copy of United States Patent No. 6,353,581 | 27-39 |

EXHIBIT A



US006328766B1

(12) **United States Patent**

Long

(10) Patent No.: **US 6,328,766 B1**

(45) Date of Patent: **Dec. 11, 2001**

(54) **MEDIA ELEMENT LIBRARY WITH NON-OVERLAPPING SUBSET OF MEDIA ELEMENTS AND NON-OVERLAPPING SUBSET OF MEDIA ELEMENT DRIVES ACCESSIBLE TO FIRST HOST AND UNACCESSIBLE TO SECOND HOST**

(75) Inventor: **Robert M. Long**, San Diego, CA (US)

(73) Assignee: **Overland Data, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/104,406**

(22) Filed: **Jun. 25, 1998**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/786,702, filed on Jan. 23, 1997, now abandoned.

(51) Int. Cl.⁷ ............................. G06F 12/14; G06F 12/00; G06F 13/00; G11B 17/22; G11B 15/00

(52) U.S. Cl. ................................ 718/8; 710/15; 710/17; 710/36; 710/104; 711/4; 711/111; 711/152; 711/163; 369/34; 369/36; 369/56; 360/69; 360/131; 360/134

(58) Field of Search ...................................... 710/100, 129, 710/8, 9, 15, 17, 36, 104; 711/4, 111, 112, 114, 152, 163; 360/69, 92, 93, 131, 132, 134; 369/34, 36, 56, 191, 192

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,164,909 * | 11/1992 | Leonhardt et al. ............. 364/478.03 |
| 5,303,214 * | 4/1994 | Kulakowski et al. ................. 369/34 |
| 5,386,545 | 1/1995 | Gombos, Jr. et al. . |
| 5,502,811 | 3/1996 | Ripberger . |
| 5,502,836 | 3/1996 | Hale et al. . |
| 5,511,177 | 4/1996 | Kagimasa et al. . |
| 5,530,850 | 6/1996 | Ford et al. . |
| 5,594,922 * | 1/1997 | Suzuki et al. ............................ 710/17 |
| 5,768,141 * | 6/1998 | Hanaoka et al. ................. 364/478.02 |
| 5,956,301 * | 9/1999 | Dimitri et al. .......................... 369/34 |
| 6,031,798 * | 2/2000 | James et al. ............................ 369/34 |
| 6,038,490 * | 3/2000 | Dimitri et al. ......................... 700/214 |
| 6,044,442 * | 3/2000 | Jesionowski ........................ 711/153 |
| 6,044,444 * | 3/2000 | Ofek ...................................... 711/162 |
| 6,185,165 * | 2/2001 | Jesionowski et al. ................. 369/34 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 276 967 A2 | 1/1988 | (EP) . |
| 0 458 567 A2 | 5/1991 | (EP) . |
| 0 578 918 A2 | 3/1993 | (EP) . |
| 0 645 693 A1 | 9/1994 | (EP) . |
| WO 96/06393 | 2/1996 | (WO) . |

OTHER PUBLICATIONS

Overland Data, Inc., L490/L490E SCSI Specification, Feb. 1995 (First Revision).

IBM Internatinal Technical Support Centers, IBM RAMAC Array Family, GG24–2509.00, Dec. 1994.

IBM International Technical Support Centers, A Practical Guide to the IBM 7135 RAID Array, SG24–2565.00, Jul. 1995.

IBM Technical Disclosure Bulletin, "Tape Array Storage System", vol. 36, No. 3, Mar. 1, 1993, pp. 369–370.

* cited by examiner

Primary Examiner—Thomas Lee
Assistant Examiner—Nguyen Tanh Q
(74) Attorney, Agent, or Firm—Knobbe Martens Olson & Bear

(57) **ABSTRACT**

A media element library defines a viral configuration different from the physical configuration of media and drives actually present in the library. A plurality of host computer systems communicate with the library as if they were communicating with a conventional library having a physical configuration identical to the virtual configuration defined by the library.

**11 Claims, 8 Drawing Sheets**





*FIG. 1*

Exhibit A, Page 12



FIG.2



FIG.3



FIG. 4



*FIG.5*



*FIG.6*



*FIG. 7*



FIG.8

FIG.9A

FIG.9B

FIG.10

Exhibit A, Page 19

US 6,328,766 B1

1

## MEDIA ELEMENT LIBRARY WITH NON-OVERLAPPING SUBSET OF MEDIA ELEMENTS AND NON-OVERLAPPING SUBSET OF MEDIA ELEMENT DRIVES ACCESSIBLE TO FIRST HOST AND UNACCESSIBLE TO SECOND HOST

### RELATED APPLICATIONS

This application is a continuation-in-part of U.S. application Ser. No. 08/786,702, also entitled "Virtual Media Library" and filed on Jan. 23, 1997 now abandoned. The disclosure of U.S. application Ser. No. 08/786,702 is hereby incorporated by reference in its entirety.

### BACKGROUND OF THE INVENTION

The present invention relates to data processing systems and, more specifically, to automated data storage and retrieval systems which comprise a library of media elements as well as one or more drives for reading from and writing to the media elements in the library.

Magnetic tape cartridges, magnetic disks, and optical disks are all widely used as peripheral memory storage devices for computer systems. Large computer systems often operate in conjunction with external libraries having dozens of such media elements as well as the media element readers used to retrieve and record data. Although originally such media elements were selected and loaded manually, automated libraries were developed to expedite the handling of the media. These systems include means for accessing a desired media element, retrieving it from its storage position, and loading it into an appropriate reader. More recently, instruction sets have been created which define a communication protocol between the host computer system and the library. The instruction sets include commands to move media to different locations within the library and, of course, to load media into drives, place the media in a particular logical position, and read or write from and to specified regions of the media.

As data storage requirements for computer systems have increased from megabytes to gigabytes to terabytes, the development of automated media libraries has received considerable attention. Some embodiments of such libraries comprise a small number of media elements, six or ten being typical, and one or two drives housed in a single enclosure. Cabinet and even room sized systems have also been developed which hold a much larger number of media elements and drives, and which further comprise robotic arms, often translatable on all three axes, which remove media elements from storage and place them in drives. Furthermore, due to the increasing use of wide-area-networks, interconnected library systems forming a single dispersed database have become more common.

However, one problem with traditional library systems is that only one host computer may be effectively attached to a library at a time. This is a result of the fact that host computers attached to the library keep a log of the contents of the media contained in the library. If a second computer is attached to the same library, the second computer may modify the contents of the library which is being relied upon by the first computer. This poses a problem for network system administrators which prevents the use of cost effective large library systems. Typically, separate file servers in a network will have a dedicated small media library for use by the particular host file server. Data transfer requests from network clients must be routed to the library through the appropriate host. Data storage flexibility is thus reduced and

2

data storage capacity is rendered more expensive because multiple physical libraries are required.

Accordingly, a need exists in the art for improvements in the distribution of data, storage capacity among a plurality of computers such as are present in a computer network.

### SUMMARY OF THE INVENTION

In one embodiment, the invention comprises a media element library having a plurality of input-output interfaces, or alternatively a network interface, for communicating with a plurality of host computers. The library may comprise a plurality of media elements, wherein each media element is a member of one of a plurality of separate subsets of the plurality of media elements, and wherein each of the plurality of separate subsets is assigned for read/write access solely to a respective one of the plurality of host computers.

Methods of storing and retrieving data are also provided. In one embodiment, such a method comprises transparently allocating a first set of media element library resources to use by a first host computer and transparently allocating a second set of media element library resources to use by a second host computer. With this method, the first host computer and the second host computer may store and retrieve data to and from separate portions of the media element library without interfering with one another.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a cutaway perspective view of the physical layout of a magnetic tape library.

FIG. 2 is a block diagram of the interconnections between the components of the tape library of FIG. 1 and a host computer system.

FIG. 3 is a block diagram of the interconnections between the components of a second embodiment of a data storage system.

FIG. 4 is a block diagram of the interconnections between the components of a third embodiment of a data storage system.

FIG. 5 is a block diagram of the library controller of FIG. 2.

FIG. 6 is a block diagram of the library controller of FIG. 3.

FIG. 7 is a block diagram of the library controller of FIG. 4.

FIG. 8 is an illustration of an industry standard format for a library status request command issued by a host computer.

FIG. 9A is an illustration of an industry standard format for the header portion of a library response to the status request command of FIG. 4.

FIG. 9B is an illustration of an industry standard format for a data portion of a library response to the status request command of FIG. 4.

FIG. 10 is an illustration of an industry standard format for a move medium request issued by a host computer.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Preferred embodiment of the present invention will now be described with reference to the accompanying Figures, wherein like numerals refer to like elements throughout. The terminology used in the description presented herein is intended to be interpreted in its broadest reasonable manner, even though it is being utilized in conjunction with a detailed description of certain specific preferred embodiments of the

US 6,328,766 B1

3

present invention. This is further emphasized below with respect to some particular terms used herein. Any terminology intended to be interpreted by the reader in any restricted manner will be overtly and specifically defined as such in this specification.

A cutaway view of an example tape cartridge library system is illustrated in FIG. 1. It will be appreciated, however, that as described briefly above, media libraries come in many forms, and include a wide array of media types such as optical disk as well as magnetic tape, and also include a variety of different numbers of drives, tapes, and robotic arms for media transportation. Such differences in media type and hardware configuration do not affect the applicability of the present invention to these diverse styles of library. Accordingly, the system described in conjunction with the following figures is exemplary only.

Referring now to FIG. 1, a cutaway perspective view of a preferred magnetic tape library system 10 incorporating two tape drives 12 and 13 and a tape storage magazine 14 is illustrated. Further provided inside library 10 is a power supply (not shown) as well as a library control module 16. The circuitry of the library control module 16 and its response to commands from an external host computer (not shown in FIG. 1) are described in more detail below with reference to FIGS. 3–7.

The library 10 also preferably includes a media transporter 18 which may be threadably secured to a drive shaft 20, which is in turn secured just above the floor of the library 10 in bearings on the front and rear panels. Lateral motion of the media transporter 18 is produced by a motor 24 which is secured to the inside of the library 10 housing, and which has a rotor coupled to the threaded drive shaft 20 by a drive belt 26. In a library configured as shown in FIG. 1, the media transporter moves back and forth along the drive shaft 20 so as to be adjacent to tape drive 12, tape drive 13, or any of the storage slots in the tape storage magazine 14. Overall operation of the library 10 proceeds as follows. Upon the receipt of commands from the library control module 16, the media transporter 18 is positioned in front of a particular tape cartridge 30 in the magazine 14. The media transporter 18 pulls the tape cartridge 30 from the magazine 14 into its own housing, and then travels toward the rear of the library 10.

When adjacent to the appropriate drive 12 or 13, the media transporter 18 pushes the tape cartridge 30 out of its housing and into the drive 12, 13. It can be appreciated that a variety of functions can be performed by the media transporter 18 in addition to loading a tape cartridge into a drive. For example, a tape cartridge could be moved to a different empty storage location in the magazine 14. In one preferable library embodiment, a pass through slot 28 is provided so that the media transporter 18 can eject tape cartridges out of the library 10. If desired, a second media transport device can be utilized to move such an expelled tape cartridge to another library. Other library configurations adapted for use with the present invention in addition to that shown in detail in FIG. 1 have been developed. For example, library systems are described in U.S. Pat. No. 5,285,333 to Barr, et al., U.S. Pat. No. 5,388,946 to Baur, U.S. Pat. No. 5,429,470 to Nicol et al., and U.S. Pat. No. 5,277,534 to Anderson et al. being several examples. The disclosures of each of these patents are hereby incorporated by reference in their entireties. It should also be kept in mind that libraries of other media types such as optical disks are also contemplated for use in conjunction with the present invention.

As will also be illustrated below, the media transporter 18 is under the direct control of the library control module 16.

4

The library control module 16 further receives commands from a host computer system which direct it to produce, in the library 10, action desired by the host system. In some embodiments of the library 10, the library control module 16 can also interface with users through a physical keypad/display unit 32.

FIG. 2 illustrates a library 10 interfaced to a single host computer 36 through a communication bus 38a coupled to the library control module 16, which may advantageously be of Small Computer System Interface (SCSI) format. The host computer system 36 may be a personal computer, a mainframe, a local area network server, or any of a wide variety of data processing apparatus well known to utilize media, libraries for data storage. The communication bus 38 connects to the library control module 16 inside the library 10 itself. As is further shown in FIG. 2, the library control, module 16 is also preferably interconnected to a keypad/display unit 32, for communicating a relatively limited set of commands and status messages between the control module 16 and a library user.

The host computer system 36 also communicates with each drive 12, 13 over a communication bus 38b. This communication bus 38b may also advantageously be of Small Computer System Interface (SCSI) format, and as illustrated in FIG. 2, may comprise the same SCSI bus as the bus 38a used to communicate with the library control module 16. The library control module also communicates with the media transporter 18 through another communication bus 44. Also illustrated in FIG. 2 are media storage locations 46a through 46j. In the illustrated example, storage locations 46c, e, and f are vacant, and the remainder house magnetic tape cartridges.

In normal operation, the library 10 receives commands from an application program such as an automated data backup program running on the host computer system 36. These commands are interpreted by the library control module 16, which then carries out the commands by returning status information to the host and by appropriately controlling the actions of the media transporter 18. As mentioned above, the library control module 16 may also interface with library users through a keypad/display unit 32 via another communication link 46. Simple commands such as a reset command and certain status messages may be relayed via this interface.

One aspect of the present invention is directed to the configuration of the library control module 16 and its responses to commands received from the host computer system 36. As is explained in detail below, a preferred media library 10 in accordance with the present invention will interpret and execute identical commands from the host computes system 36 in different ways depending upon how the library user configures the library control module 16. In an especially advantageous embodiment, this different command execution is transparent to the host computer 36. As the physical nature of the library is in, this way hidden from the host computer system 36, it may be stated that the host 36 is, interfacing with a "virtual library", which appears to have a particular configuration of tapes, drives, and data which is different from the actual physical configuration of tapes, drives, and data in the library 10.

FIGS. 3 and 4 illustrate two embodiments of the invention. FIG. 3 illustrates the library 10 connected to a plurality of host computers 37 wherein each of the plurality of host computes is allocated a subset of the total number of media storage locations 46a through 46j. FIG. 4 shows the library 10 connected to a plurality of host computers 39 through a

Exhibit A, Page 21

US 6,328,766 B1

5

network connection. Each of these three embodiments will be described in further detail below.

Referring now to FIG. 3, in a second embodiment a plurality of host computers 37 each have a communication bus 39a, 39b, 39c connected to the library controller 16. In the embodiment of FIG. 3, these communication busses are independent. They may, however, comprise a common bus such as a common SCSI bus. When a common SCSI bus is used, for example, library controller 16 response to commands issued by the different hosts 37 will vary depending on the SCSI ID of the host 37 which issued the command. In this embodiment, each of the media storage locations 46a through 46j are grouped into one of three sets 31, 33, and 35. Each of the sets 31, 33, 35 are allocated by the controller for use by one of the three host computer systems 37, respectively. As the controller allocates the storage locations among the host computers, each subset of the media elements 30 present in a given group of storage locations is available for read/write access to one of the host computers, but is unavailable for read/write access to the other host computers. Advantageously, the allocation is transparent to the separate hosts, effectively creating a plurality of "virtual libraries" which are independently used by each of the three host computers. In the specific embodiment of FIG. 3, set 31 has two media locations 46a and 46b. Set 33 has five media locations 46c through 46h, and set 35 has three media locations 46h through 46j.

The allocation of each of the storage locations 46a through 46j may be programmed into the controller 16 through the use of the keypad/display unit 32. Alternatively, the allocation of each of the storage locations may be implemented by sending appropriate configuration commands from one of the host computers 37 to the library control module 16. It may also be appreciated that the allocation of each the number of the media locations 46a through 46j may be dynamically altered depending on requirements of the host computers 37. For example, a system administrator may decide to remove the media locations 46c and 46d from set 33 and the add media locations 46c through 46h, and to set 31 by re-programming the controller's allocation of media. By allocating a subset of the media locations 46a through 46j for use by each of the host computers, the risk is eliminated that one one of the host computers 37 will disadvantageously modify the data that is being relied won by one of the other host computers 37.

To further reduce the risk of conflict between the host computers 37, each of the drives 12, 13, and 15 present in the media library 10 may be reserved for read/write access by respective ones of the host computers 37. Preferably, there is at least one drive in the library per host computer 37. It will be appreciated that there may be additional drives, and these additional drives may also be allocated among the several hosts. For example, one host may be allowed access to a specific set of three drives, one to a set of two drives, and the remaining hosts to one drive each. Additionally, the library 10 may have a plurality of media transporters (not shown), wherein each of the plurality of robots is dedicated for use by one of the host computers 37. The drives are also connected to the host computers 37 via a communication bus 39d. This communication bus 39d also may comprise several independent busses, may be a single bus, or may be common to the bus 39a, 39b, 39c connecting the hosts 37 to the library control module 16.

Referring to FIG. 4, multiple host computers 37 are connected by a network 41 to a media element library 10. In this embodiment, therefore, the library itself comprises a network interface for direct communication with a plurality

6

of hosts. Library controller 16 response to commands may vary with the IP address of the issuing host, for example, to again by create "virtual libraries" for each host. As with the embodiment described with reference to FIG. 3, different portions of the media locations 46a through 46j are allocated by the controller 16 for use by different host computers 37. The network 41 may include any type of electronically connected group of computers including, for instance, the following networks: Internet, Intranet, Local Area Networks (LAN) or Wide Area Networks (WAN). In addition, the connectivity to the network may be, for example, remote modem, Ethernet (IEEE 802.3), Token Ring (IEEE 802.5), Fiber Distributed Datalink Interface (FDDI) or Asynchronous Transfer Mode (ATM). Note that computing devices may be desktop, server, portable, hand-held, set-top, or any other desired type of configuration.

Each of the host computers 37 includes a converter (not shown), which converts a media storage command from an application running on the respective host computer into a network command. The converter sends the network command over the network 41 to the library controller 16. By connecting the library 10 directly to a network 41, each of the host computers 37 need not have an individual connection to the library 10. In this embodiment, the controller 16 is configured to convert network commands into appropriate internal library commands (such as SCSI commands) which are used to control the media transporter 18 and the drives 12, 13.

In analogy with the embodiment of FIG. 3, virtual libraries are created by configuring the controller such that each of the host computers 37 have one of the sets of media element storage locations 31, 33, and 35, 43 transparently allocated for their respective use, thereby eliminating any conflict between the host computers 37 for the same media element. Similar to the allocation process for the embodiment of the invention shown in FIG. 3, the allocation of each of the storage locations 46a through 46j may be made through the use of the keypad/display unit 32. Alternatively, the assignment of each of the storage locations may be implemented by sending a command from one of the host computers to the library control module 16. Also as described above, the allocation of each of the media locations 46a through 46j may be dynamically altered depending on requirements of the host computers.

Referring now to FIGS. 5, 6, and 7, the components of the library control module 16 are described below for each of the embodiments shown in FIGS. 2, 3 and 4, respectively. For each of these embodiments, the implementation of the virtual library is advantageously done inside the library control module 16.

Referring now to FIG. 5, the library control module 16 includes a microprocessor circuit 50, which may advantageously comprise an Intel 386, 486, or Pentium (TM) processor chip. The microprocessor 50 interfaces with a memory and I/O bridge 54 via a host bus 56. The memory and I/O bridge 54 in turn interfaces with an I/O bus 58 and a memory bus 60, and functions to buffer data and command transfers to and from the microprocessor 50. The memory and I/O controller 54 also create a direct memory access (DMA) channel between the I/O devices and the library control module mass memory 64.

In a preferred embodiment of the present invention, the memory of the library control module 16 comprises two portions, a data and instruction memory portion 64, and a configuration memory portion 66. The data and instruction memory stores instructions processed by the microprocessor

US 6,328,766 B1

7

**50**. The library control module **16** also preferably comprises a configuration memory **66**. The configuration memory is for storing information relating to the user defined "virtual" configuration of the library. In a preferred embodiment, the configuration memory **66** is non-volatile, comprising a battery, backed up RAM, EEPROM, flash memory, or other non-volatile memory device. This allows the library **10** to retain its virtual configuration information when the library is powered down.

The I/O bus **58** of the library control module **16** is connected to the host computer **36** through an industry standard SCSI interface circuit **68**. The SCSI I/O circuit coordinates command and data flow between the host computer **36** and the microprocessor **50** of the library control module **16**. The I/O bus **58** of the library control module **16** is also connected to a device I/O circuit **70** for interfacing with the media transporter **18** inside the library **10**, and further is connected to a keypad I/O circuit **72** for interfacing with the front panel keypad **32**.

In operation, the library control module **16** receives commands and data from the host computer system **36**. In one preferred embodiment of the present invention, the commands issued by the host computer **36** are among the set of industry standard SCSI commands developed for host-library communication. These commands are interpreted by a program being run by the microprocessor **50**, which controls the operations of the media transporter **18** in accordance with host commands. As mentioned above and explained in detail below with reference to FIGS. 8 through 10, it is one aspect of a preferred embodiment of the present invention that the commands received from the host computer **36** are interpreted and/or handled differently depending on the information stored in the configuration memory **66**. It will be appreciated by those skilled in the art that various computer architectures could be utilized to produce the configuration dependent interpretation and execution of commands from the host computer system **36**. Accordingly, the data flow illustrated in FIG. 3 is intended to be exemplary rather than limiting.

Referring now to FIG. 6, a second embodiment of the library is illustrated having multiple input-output interfaces for communication with a plurality of host computers. Thus, FIG. 6 illustrates some of the internal components of a library control module **16** suitable for use in the system shown in FIG. 3. The I/O bus **58** of FIG. 6 is connected to the host computers **37** through a plurality of, for example, industry standard SCSI interface circuits **68**. As mentioned above with reference to FIG. 3, these communication busses could also be consolidated onto a single bus. Data flow and communication protocols may be analogous to that described above with reference to FIG. 5. In one application, the configuration memory **66** stores information which defines media element membership in subsets of available media elements which are allocated to specific host computers **37**.

In FIG. 7, a third embodiment of the library control module **16** is illustrated which is suitable for use in the data storage system of FIG. 4. The I/O bus **58** of the library control module **16** shown in FIG. 7 includes a network interface port **75** for communicating with a plurality of host computers **39** through a computer network. The network circuit **75** coordinates command and data flow between the host computers **39** and the microprocessor **50** of the library control module **16**. Similar to the other embodiments, the I/O bus **58** of FIG. 7 is also connected to a device I/O circuit **70** for interfacing with the media transporter **18** inside the library **10**, and further is connected to a keypad I/O circuit

8

**72** for interfacing with the front panel keypad **32**. Once again, the configuration memory **66** may store information which defines media element membership in subsets of available media elements which are allocated to specific host computers **39**.

The function of the library control module **16** and its processor **50** is the interpretation and execution of commands received from the host computer system **36** or multiple host computer systems **37**, **39**. For example, a host computer may instruct the library to move a media element from one storage location to another, or may instruct the library to read or write at a particular location on a media element In preferred embodiments of the present invention, as well as on many prior art library systems, these instructions are interpreted and carried out by a software program running on the library control module. In a SCSI interface implementation of a library, as in one example described herein, such commands issued by a host computer system are defined by a standard library command set defined by industry convention. Although commands to the library **10** from a host computer may be of any format as long as the library **10** is designed and programmed to understand the commands being issued by the host, the industry standard SCSI host-library communication protocol is used herein as an example of one embodiment of the present invention.

Referring now to FIG. 8, several of the significant features of the SCSI command referred to as a "read element status" command are illustrated. When this command is issued by a host computer **36** to the library **10**, the library **10** returns information to the host computer regarding the library configuration including the number of media elements, drives, and robots. This command is comprised of several important portions. First, an opcode field **80** assigned to this instruction, and second a series of parameters for informing the library **10** what status information a given host computer **36**, **37**, **39** wish to receive. The parameters include (1) an element type field **82**, which indicates what type of element, i.e. media elements, drives, and/or robots, should be reported on by the library **10**, (2) an element starting address **84**, indicating the lowest address of the specified element type which should be reported by the library **10**. The command also includes additional parameters such as an allocation length field, specifying how much memory has been allocated by the host for data received from the library **10** in response to the command.

The standard format response to one particular read element status command requesting status information regarding the media element storage slots is illustrated in FIGS. 9a and 9b. The response comprises an eight byte header illustrated in FIG. 9a, followed by several twenty-six byte storage element status pages, one for each storage slot being reported. Referring now to FIG. 9b, the header comprises information concerning the first element address reported **88**, the number of elements being reported **90**, and the total number of bytes of information **92** of available status information regarding the media element storage locations.

FIG. 9a illustrates the content of each returned status page containing information regarding the media element storage slots reported by the library **10**. The information in the status page includes (1) an element type code **94**, which in this instance would be the element type code assigned to media element storage slots, (2) the address of the storage slot **96** being reported in this particular status page, (3) an access bit **98** indicating whether or not the media transporter **18** is allowed access to this slot, (4) a full bit **100**, indicating whether or not a media element such as a tape cartridge is

US 6,328,766 B1

9

contained in the slot, and (5) a source address field 102, indicating the address which last contained the media element currently stored in the slot being reported.

It can be appreciated that a conventional library will respond to the read element status command of FIG. 8 with information concerning the physical configuration of the library. For example, a read element status command could request information concerning any one or all of the of drives, storage slots, or robots in a media library. As seen above, a conventional library response would include the total number and addresses of the elements requested, the presence or absence of media elements in storage slots, as well as other information about the library 10, and this information would correspond directly to the physical configuration of the library 10. Other host commands which are issued to a library also fit this paradigm.

In FIG. 10, for example, the format of the "move media" command is illustrated. This command includes an opcode field 104, and additionally includes (1) the address 106 of the robot to be used to perform the transfer, (2) the current address 106 of the media element to be moved, and (3) the destination address 110 that the media element is to be moved to. In a conventional library 10, each storage slot is assigned an address, and accordingly, this command causes the transfer of one media element from a first defined physical location to a second defined physical location. There is, therefore, a direct correspondence between command parameters such as storage slot addresses and the physical configuration of the library 10.

In the preferred library 10 of the present invention however, the correspondence between addressed elements and action taken by the library 10 can vary such that the host computers 36, 37, 39 send commands based on a virtual library configuration that is different from the physical configuration actually present.

Such an interface to a virtual library can improve library performance characteristics as seen by the host computers 36, 37, 39 without complicating the set-up, maintenance, or creation of application software utilizing the library 10 as a data storage device. Data storage system flexibility may therefore be enhanced by allowing a plurality of host computers to each interface to a virtual library comprising a subset of physical library resources. By making the resource allocation being utilized by the library 10 transparent to the host computer system or systems, however, the library's response to host commands must be altered, and must further be altered in different ways depending on the host computer issuing the command.

When the controller is configured to simultaneously communicate with a plurality of hosts, groups of media elements may be allocated for use by only one of the plurality of hosts. Also, individual ones or specific groups of drives may also be allocated for use by only one of the plurality of hosts. The library response to a read element status command will thus differ depending on the host which issued the command. The response will only include those library resources which are available to that particular host. With respect to, for example, the move media and write commands of FIGS. 10 and 11, the controller may remap source and destination addresses from the virtual configuration seen by the host to the appropriate physical resources allocated to that host.

Another function performed by the controller in multi-host mode is the queuing and prioritization of commands received from the plurality of host computers. When the library receives commands from other hosts before completing a command from a first host, the additional com-

10

mands are queued in a memory in the controller. The commands may then be sequentially performed either in the order received, or in a different order if library efficiency of operation may be improved by promoting some commands above others in the queue.

It can be appreciated from the foregoing that a preferred media library according to the present invention is user configurable for various combinations of fault tolerance and data transfer performance while retaining an appearance to a host computer system as a conventional media library. The implementation of such fault tolerance and data transfer enhancements requires no modification of application software running on the host system 36. The actual user configuration of the library 10 can occur in several ways. In a preferred media library, the keypad interface 18 allows library 10 configuration via the keypad. Most preferably, the user can scroll through and choose from a list of pre-defined configuration options, or define their own from scratch through the keypad interface. Alternatively, a second SCSI, RS232, or other communication interface can be provided on the library which is dedicated to interfacing with a PC or other computing device which is independent from the host The PC would run software which would download configuration parameters to the library. As another alternative, a software program which can be run on the host system is used to load the configuration memory 66 with the desired parameters via SCSI communication with the library. This last alternative, however, may require the generation of several separate host configuration control programs which are compatible with different host library control programs being used at different library installations.

The foregoing description details certain preferred embodiments of the present invention and describes the best mode contemplated. It will be appreciated, however, that no matter how detailed the foregoing appears in text the invention can be practiced in many ways. Details of the library status reporting to the host may vary considerably in its details, while remaining within the spirit and scope of the invention disclosed herein. As is also stated above, it should be noted that the use of particular terminology when describing certain features or aspects of the present invention should not be taken to imply that the broadest reasonable meaning of such terminology is not intended, or that the terminology is being re-defined herein to be restricted to including any specific characteristics of the features or aspects of the invention with which that terminology is associated. The scope of the present invention should therefore be construed in accordance with the appended Claims and any equivalents thereof.

What is claimed is:

1. A data storage system comprising:

a plurality of media element drives;

a plurality of media elements, all of which are readable in each of said plurality of media element drives;

a plurality of media element storage locations;

a moveable carriage adapted to transport media elements from at least one of said media element storage locations to at least one of said media element drives;

a plurality of host computers; and

a controller coupled to said plurality of media element drives, said moveable carriage, and said plurality of host computers, wherein said controller is configured such that a subset of said plurality of media elements and a subset of said plurality of media element drives are available for read/write access by a first one of said plurality of host computers and are unavailable for

Exhibit A, Page 24

US 6,328,766 B1

11

read/write access by a second one of said plurality of host computers.

2. In a media element library, a method of executing a plurality of data manipulation commands comprising:

pre-allocating subsets of media elements present in said media element library to servicing requests from respective ones of a plurality of host computers so that no subset contains the same media element as another subset;

pre-allocating subsets of media element drives present in said media element library to servicing requests from respective ones of said plurality of host computers so that no subset contains the same media element drive as another subset;

wherein all media elements are readable in each of said media element drives;

wherein a subset of said media elements and a subset of said media element drives are available for read/write access by a first one of said plurality of host computers and are unavailable for read/write access by a second one of said plurality of host computers;

receiving a plurality of data manipulation commands from said plurality of host computers coupled to said media element library;

queuing said plurality of data manipulation commands in a memory of said media element library; and

sequentially performing said data manipulation commands.

3. The data storage system of claim 1, additionally comprising a user configurable memory storing data defining said controller's response to commands from said plurality of host computers such that said subset of said plurality of media elements and said subset of said plurality of media element drives is user selected.

4. The data storage system of claim 1, wherein said controller comprises a network interface routed to each one of said plurality of host computers.

5. The data storage system of claim 4, wherein the network interface has a Token Ring or Ethernet connector for connecting to the plurality of host computers.

6. The data storage system of claim 1, wherein said controller comprises an input-output interface for coupling to said plurality of host computers.

7. The data storage system of claim 1, wherein said controller comprises a plurality of input-output interfaces for coupling to respective ones of said plurality of host computers.

8. The data storage system of claim 7, wherein said input-output interfaces comprise SCSI interfaces.

9. The data storage system of claim 1, wherein said media elements comprise magnetic tape cartridges.

12

10. A method of communicating information between a host computer system and a data storage library, said method comprising the steps of:

dividing a plurality of media storage locations into a first plurality of portions, wherein each of a plurality of host computers is associated with a separate one of said first plurality of portions;

dividing a plurality of media element drives into a second plurality of portions, wherein each of the plurality of host computers is associated with a separate one of said second plurality of portions of media element drives;

sending a first request for information regarding the number of media element storage locations in said library from one of the plurality of host computers to the library;

sending a second request for information regarding the number of media element drives in said library from said one of the plurality of host computers to the library;

sending a response to said first request from said library to said one of the plurality of host computers, said response including only the number of media element storage locations in the portion of the first plurality of portions associated with said one of the plurality of host computers; and

sending a response to said second request from said library to said one of the plurality of host computers, said response including only the number of media element drives in the portion of the second plurality of portions associated with said one of the plurality of host computers,

whereby said one of the plurality of host computers sees only its associated portion of the media storage locations and its associated portion of the media element drives, and

whereby the media element storage locations in said one of said first plurality of portions and the media element drives in said one of said second plurality of portions associated with said one of said plurality of host computers are available for read/write access by said one of said plurality of host computers are unavailable for read/write access by an another one of said plurality of host computers.

11. The method of claim 10, wherein the act of sending a request and the act of sending a response, includes the act of sending a request and sending a response over a computer network.

*  *  *  *  *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,328,766 B1                                     Page 1 of  1
DATED         : December 11, 2001
INVENTOR(S)   : Robert M. Long

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 1,
Line 41, please delete "front" and insert therefore, -- from. --

Column 5,
Line 45, please delete "won" and insert therefore, -- upon. --

Column 6,
Line 3, please delete "again by" and insert therefore -- again transparently. --

Signed and Sealed this

Twenty-second Day of July, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

EXHIBIT B



US006353581B1

(12) **United States Patent**      (10) **Patent No.:**      **US 6,353,581 B1**
     Offerman et al.               (45) **Date of Patent:**        **Mar. 5, 2002**

(54) **MEDIA ACCESS IN A MEDIA LIBRARY**

(75) Inventors: **Karl B. Offerman; Kevin T. Kersey,** both of San Diego, CA (US)

(73) Assignee: **Overland Data, Inc.,** San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/191,222**

(22) Filed: **Nov. 13, 1998**

**Related U.S. Application Data**

(60) Provisional application No. 60/065,706, filed on Nov. 14, 1997.

(51) Int. Cl.[7] ........................... **G11B 17/22; G11B 15/68**
(52) U.S. Cl. ........................... **369/36;** 369/192; 360/92
(58) Field of Search ............................. 369/32, 33, 34, 369/36, 38, 178, 179, 191, 192; 360/92, 98.04, 98.05, 98.06

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,537,267 A  *  7/1996  Nelson et al. ................. 360/92

5,757,738 A  *  5/1998  Ohba et al. ................... 369/34
5,847,897 A  * 12/1998  Marlowe ...................... 360/92
5,910,939 A  *  6/1999  Shiba et al. ................. 369/178
5,953,293 A  *  9/1999  Kajiyama et al. ............. 369/37

OTHER PUBLICATIONS

Spectra Logic: 4mm Automated Tape Library; Product Information document on Spectra 4000 consisting of 4 pages (Date Unknown).

ATL Products: Solutions for the Implementing Data Storm; Product Information sheet on ACL 4/52 (1995).

* cited by examiner

*Primary Examiner*—David L. Ometz
(74) *Attorney, Agent, or Firm*—Knobbe Martens Olson & Bear LLP

(57)            **ABSTRACT**

A media element library includes a magazine of media element storage locations comprising at least one cell adjacent to an opening in the housing. The cell may be moveable so as to extend toward the opening in the housing of the media element library, thereby facilitating user access to a media element stored in the moveable cell.

**22 Claims, 7 Drawing Sheets**



**U.S. Patent**     Mar. 5, 2002     Sheet 1 of 7     US 6,353,581 B1



FIG. 1

Exhibit B, Page 28



*40*

DELIVER MEDIA ELEMENT
TO CELL ADJACENT OPENING
IN HOUSING

*42*

MOVE THE CELL TOWARD
THE OPENING IN THE
HOUSING

*44*

REMOVE THE MEDIA
ELEMENT

*FIG. 2*



FIG. 3



*FIG. 4*

Case 3:10-cv-01700-JLS-BLM   Document 1   Filed 08/13/10   Page 35 of 44

FIG. 5



*FIG. 6*

Exhibit B, Page 33



*FIG. 7*

US 6,353,581 B1

1

# MEDIA ACCESS IN A MEDIA LIBRARY

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims priority under 35 U.S.C. § 119(e) to U.S. Provisional Application Serial No. 60/065,706 entitled MEDIA ACCESS IN A MEDIA LIBRARY, filed on Nov. 14, 1997. The disclosure of the MEDIA ACCESS IN A MEDIA LIBRARY provisional patent application is hereby incorporated by reference in its entirety.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to the field of data processing systems. More particularly, the invention pertains to a media element library which allows a user to easily access a media element inside a magazine of media elements without having to remove the magazine from the media element library. In one advantageous embodiment, the media elements are tape cartridges.

### 2. Description of the Related Art

Magnetic tape cartridges, magnetic disks and optical disks are all widely used as peripheral memory storage devices for computer systems. Large computer systems often operate in conjunction with external libraries of several, dozens, or even hundreds of such media elements. Although originally such media elements were selected and loaded manually, automated libraries were developed to expedite the handling of the media. These systems typically include robotics for accessing a desired media element, retrieving it from its storage position and loading it into an appropriate reader.

As data storage requirements for computer systems have increased from megabytes to gigabytes to terabytes, the development of automated media libraries has received considerable attention. Some embodiments of magnetic tape libraries comprise a small number of magnetic tape cartridges, 5 to 15 being typical, and one or two tape drives housed in a single enclosure. Cabinet and even room-sized systems have also been developed which hold a much larger number of tapes and drives and which further comprise robotic arms, usually translatable on all three axes, which remove tapes from storage and place them in tape drives.

Security of the physical media elements is of concern in these libraries. Generally, automated tape libraries are locked enclosures or cabinets, allowing complete access to the media elements stored inside only to users with the appropriate key or password. However, it is often desirable to allow limited access to media elements to other, lower level users of the system. In these cases, "mail slots" have been provided which receive individual media elements or groups of media elements from the internal robotic transport mechanism and route them outside the enclosure through the mail slot. Use of the mail slot may itself be limited to users having particular passwords, and system control software may dictate what media elements are available through the mail slot to various users having these passwords. For example, the system administrator may have access to the entire cabinet, while lower level clerks have access only to the mail slot to place blank tapes into the library, or to retrieve selected media elements from the library one or a few at a time. Users not given passwords by the system administrator may be able to store and retrieve data electronically, but will not be able to physically access any physical media elements in the library.

These prior art systems are complex and expensive to manufacture, requiring an independent transport path

2

between a rack or magazine of media element storage locations and the mail slot. A data storage and retrieval system which allows a user to quickly add or replace tape cartridges without having to remove the magazine of media elements, without requiring complicated transport mechanisms, and without limiting system options for media access security has long been manifest.

## SUMMARY OF THE INVENTION

In one embodiment, the invention comprises a media element library comprising a housing having a door, and a plurality of coupled media element storage locations forming a media element magazine. In this embodiment, at least a first media element storage location of the media element magazine is positioned relative to the door such that a media element in this storage location is accessible from outside the housing when the door is open. In addition, at least a second media element storage location of the media element magazine is positioned relative to the door such that a media element in this media element storage location is inaccessible from outside the housing when the door is open.

Methods of accessing media elements from media element libraries are also provided. In one embodiment such a method comprises delivering a media element to a cell of a media element magazine, moving the cell toward an opening in the media element library and away from other cells in the media element magazine, and removing the media element from the cell.

Media element magazines also are provided which may comprise a plurality of media element cells for storing media elements and a movable cell attached at one end of the media element magazine.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top plan view of a media element library illustrating incorporating aspects of the invention.

FIG. 2 is a flow chart of a method to access a media element from a media element library.

FIG. 3 is a perspective view of one embodiment of a media library which incorporates a pivotable moveable magazine cell and which has a portion of its top panel cut away to illustrate some internal components of the library.

FIG. 4 is an enlarged view of the open door and pivotally moveable cell of FIG. 3.

FIG. 5 is a perspective view of the magazine of media elements in the library embodiment of FIGS. 3 and 4, illustrating the pivotably moveable cell in the upright position.

FIG. 6 is a perspective view of the magazine of media elements of FIG. 5 illustrating the pivotably movable cell in the pivoted open position.

FIG. 7 is an exploded perspective view of the pivotably movable cell of the magazine of media elements illustrated in FIGS. 3 through 6.

## DETAILED DESCRIPTION OF THE INVENTION

Embodiments of the invention will now be described with reference to the accompanying Figures, wherein like numerals refer to like elements throughout. The terminology used in the description presented herein is not intended to be interpreted in any limited or restrictive manner, simply because it is being utilized in conjunction with a detailed description of certain specific embodiments of the invention.

US 6,353,581 B1

3

Furthermore, embodiments of the invention may include several novel features, no single one of which is solely responsible for its desirable attributes or which is essential to practicing the inventions herein described. After considering this discussion, one will understand how the features of this invention provide advantages which include flexibility in design, the ability to house numerous media elements, and easy access to any media element in the library.

FIG. 1 illustrates a media element library 10 and some of its internal components. The library 10 of FIG. 1 may include a housing 12, one or more media element readers 14 and a media element magazine 16 for holding a plurality of media elements 21, 22 in individual storage locations or cells 24. Those skilled in the art will appreciate that the media element library 10 may be of many different configurations. It may, for example, comprise multiple media element readers 14 and media element magazines 16 depending on the sophistication of data processing and storage desired. Alternatively, the library may contain only a media element magazine and no media element reader. In embodiments having no media element reader, the library 10 may be provided with an automatic transfer mechanism to transfer media elements to another module or portion of a library that includes a media element reader. One example of a media element library which includes separate modules for media elements and media element readers is provided by U.S. Pat. No. 5,285,333 to Barr et al.

The media element library 10 may also incorporate a media element transport robot 26 which travels along a track 28 and carries media elements 22 between the magazine 16 and and the media element reader 14. The robot 26 is configured such that it can insert and withdraw a media element 22 from either the cells 24 of the magazine 16 or the media element reader 14. Control of library operation is typically performed via a host computer, although some aspects of library operation may be controlled through a keypad integral to the library itself. Many aspects of media element library design and operation are set forth in co-pending U.S. patent application No. 08/555,776, filed on Nov. 9, 1995, entitled MODULAR CABINET FOR DATA STORAGE MEDIA AND DRIVES, now U.S. Pat. No. 5,870,245. The disclosure of this application 08/555,776 is hereby incorporated by reference in its entirety.

It will be appreciated that the library 10 advantageously allows for placing media elements into the library and removing media elements from the library when so desired by a user. In one embodiment of the invention, the library includes an opening 30 in the housing 12 which may be used to access the media elements 22. Although not illustrated in FIG. 1, the opening 30 may be covered by a door which can be opened by the user to access media elements 22.

As shown in FIG. 1, some embodiments of the invention include media element libraries in which a portion of the magazine 16 is proximate to the opening 30. An advantageous aspect of this design is that one of the cells of the magazine may be manually accessible to a user of the system through the opening 30. In the embodiment of FIG. 1, the end cell 32 is manually accessible through the opening. This cell may advantageously be constructed such that the media element 22 which is in this cell 32 may be manually grasped and removed from the library 10 through the opening 30. The magazine 16, the end cell 32, the opening 30, and their relative placement may also be designed such that the media element 22 in the end cell 32 is manually accessible, while the other media elements in the other cells of the magazine 16 are not accessible through the opening 30. It will be appreciated that in some embodiments, several media elements

4

(rather than only one) of the total stored in the magazine, such as a group of two or three media elements, may be accessible through the opening 30, while the remainder are not.

Thus, if the robot 26 delivers a media element to the cell 32 located at one end of the magazine 16, this media element 22 will become available for easy removal by the user of the library 10. In addition, if no media element is present in the end cell 32, the user may place a new media element into the empty end cell 32, thereby adding an additional media element to the library. This new media element may, if desired, then be moved to a different storage location 24 by use of the robot 26.

In some embodiments of the invention, one of which will be described in additional detail below, the end cell 32 of the magazine is moveable toward the opening 30 in order to further facilitate user access to the media element in that cell. In this embodiment, the cell 32 closest to the opening 30 is moveable in the direction of the arrow 38 while the remainder of the magazine 16 may remain stationary and inaccessible through the opening 30.

This configuration, wherein the mail slot form a part of the magazine, provides several advantages over currently used systems. Media access is made simpler and more efficient with less expensive hardware. Furthermore, the configuration and positioning of the magazine 16, end cell 32, and opening 30 allows different media access security levels to be implemented without providing a remote mail slot which must be separately serviced by the library robotics. As will be explained in additional detail below, one level of access authorization may comprise allowing a particular set of users to open a door covering the opening 30 so as to access only the media element in the end cell 32. A second level of access authorization may allow a particular set of users to uncouple the magazine 16 itself from the library 10, so as to remove it from the enclosure 12 and obtain access to all of the media elements 21, 22 in the library.

Referring now to the flow chart shown in FIG. 2, a method of accessing a specific media element 22 in a "moveable cell" embodiment is described. It will be appreciated that the method illustrated by FIG. 2 may be implemented, in one embodiment, with the structure shown in FIG. 1, although other hardware embodiments of this method may be devised by those of skill in the art. The method is initiated at step 40 of FIG. 2, where a desired media element is delivered to a storage location adjacent to an opening in the housing of the library. At step 42, the storage location is then moved toward the opening. Finally, at step 44, the media element is removed from the moved storage location.

This method is a significant improvement over the prior art. In currently known access methods, magazine storage locations are not provided adjacent to openings and configured such that one of the storage locations of the magazine is accessible through an opening in the housing of the library. Nor have prior art magazine storage locations been made moveable toward the opening in the housing to maximize access convenience. Those of skill in the art will further appreciate that the present invention has application to all types of data storage media such as optical disks, magnetic disks, and magnetic tape cartridges. In one advantageous embodiment described in detail with reference to FIGS. 3–7, a magnetic tape cartridge library incorporates features of the invention.

FIG. 3 illustrates a perspective view, with a cutaway portion, of a tape cartridge library 50 incorporating aspects of the invention. The library includes a housing 52, which

Exhibit B, Page 36

US 6,353,581 B1

6

Standard RS-310C rack. The display and keypad 53, which may be configured from the library as is well known commands to the library and library 50 may ing 52 are mounted several tape can be used 54. In the specific library shown, receive stating brackets has a tape drive 56 in the above, however, any number of tape drive 73 is a tape cartridge magazine 58 only cells or tape cartridge storage locations may be designed to accommodate any dge used for data storage.

nt of FIG. 3, the front panel of the library which covers an access opening in the door 62 is pivotably attached to the front sing 52 by a hinge 64 that is fastened to the the housing 12 and to the door. One end of the s adjacent to door 62 such that a movable cell gazine 58 is near the opening created when the open. The movable cell 66 on the end of the 58 may advantageously be pivotably attached to zine along the cell 66 bottom edge so that it will ward toward the opening in the front panel of the when pivoted. The outward leaning orientation is led in FIGS. 3 and 4.

s pivotably movable cell 66 may be configured to only ally surround a tape cartridge 68 mounted in the cell 66. Thus, when the pivotably movable cell 66 is leaning outward, a tape cartridge 68 present in the pivotably movable cell 66 can be easily grasped and removed by a user. Further, if the pivotably movable cell 66 is empty, a tape cartridge 68 can be easily installed by a user. Thus, cell 66 positioning relative to the door 62 comprises an advantageously designed mail slot for access to a media element in the library 50 without removing the whole magazine 58 and without interrupting normal library operation. This configuration is much simpler than prior art systems used to access media elements in libraries because it involves no robotic movement to place a tape cartridge in a user access location separate from the magazine 58.

It will be appreciated by those of skill in the art that the cell 66 need not be pivotable or moveable, as long as a media element stored there is accessible and removable through the open door 62. The pivotability of the embodiment of FIG. 3 thus assists in the ease of access, but is not necessary. In addition, as explained above, it is advantageous to configure the magazine 58 and the adjacent access opening such that no manual access is provided to any other cells of the magazine 58 except the end cell 66, so that some users may be given access to the mail slot but not to media elements in the rest of the magazine. Furthermore, as long as no access is provided to other cells of the magazine 58, the robot may continue to manipulate media elements in cells other than the end cell 66 even when the door 62 is in the open position.

FIG. 4 shows an enlarged view of the door 62 and pivotably movable cell 66 illustrated in FIG. 3. As can be seen in this Figure, the pivotably movable cell 66 may include an integral tab 70 that a user may grasp to pivot the movable cell 66 toward or away from the opening created when the door 62 is open. The tab 70 may be of many sizes and shapes, limited only by the ability of the door 62 to properly close. Furthermore, the tab 70 and the pivotably movable cell 66 may be either a single piece construction, as illustrated in FIGS. 3 and 4, or may comprise two or more pieces. In the embodiment illustrated in FIGS. 3 and 4, the tab 70 is sized such that if the moveable cell 66 is pivoted

outward when the housing door 62 is closed, a rib 63 on the inside surface of the door 62 will contact the tab 70, and the cell 66 will be returned to its upright position by the action of closing the housing door 62.

Removal and replacement of tape cartridges with the above described library system is a more convenient process than is provided by prior art libraries. For example, a user may first instruct a robot to retrieve a selected tape cartridge 68 from its location in the magazine 58 and deliver it to the movable cell 66 adjacent the open door 62 in the housing 52. Upon completion of this operation, a user can then move the cell 66 toward the opening and easily manually grasp the tape cartridge 68 so as to remove or replace it.

The pivotably moveable cell 66 may then be placed back in the upright position. If a new tape has been placed in the cell 66, the user may then instruct the robot to access the movable cell 66 as a normal media storage location provided as part of the magazine 58, or may instruct the robot to remove the tape cartridge 68 from the movable cell 66 and deliver the tape cartridge 68 to any other cell 60 in the magazine 58 for storage.

The magazine 58 of FIGS. 3 and 4 is illustrated in FIG. 5, removed from the housing 52 of the library system 50. In this embodiment, the magazine 58 contains 18 storage locations 60. The storage locations 60 may be held together as a unit by long screws (not shown) which extend from the rear side 72 of the magazine and thread into internally threaded sleeves 73 on the other end of the magazine. The magazine 58 may also be provided with a magazine handle 74 for holding onto the magazine 58 when removing the entire magazine 58 from the library 50.

The end storage location of the magazine 58 which forms the moveable mail slot may be constructed as a base portion 76, which has mounted therein the pivotably moveable cell portion 66. In the embodiment of FIGS. 5 and 6, the pivotably moveable cell portion 66 pivots about an axis 78 provided in the base 76 at the lower edge of the cell 66. In this Figure, the pivotably movable cell 66 is illustrated in the upright position.

In FIG. 6, the pivotably movable cell 66 is illustrated in the open, pivoted position so as to lean outward toward the opening in the library when the door 62 is open. As described above, the cell 66 pivots about the axis 78 adjacent to the bottom edge of the cell 66 until it contacts the top edge 80 of the magazine handle 74. Preferably, the height of the magazine handle 74 is selected so that the pivotably moveable cell 66 leans outward enough to clear the top of the opening in the library when the door 62 is open.

An exploded view of the pivotably movable cell 66 and its attachment to the base portion 76 is shown in FIG. 7. The pivotably movable cell 66 sits in a cavity 82 in the base 76. The pivotably movable cell 66 is secured to the base 76 with a pivot shaft 86 which slides into holes 88 in the cell 66 body that fit inside and are aligned with holes 90 in the base 76. The pivot shaft 86 may be held in place with two snap fit e-rings 92, thus defining the axis 78 about which the cell 66 pivots.

The pivotably movable cell 66 may also be biased into the appropriate positions by a spring 94. The spring 94 includes an upper end loop which surrounds an upper slide fit pin 98. The upper pin 98 and attached spring 94 may be secured to the pivotably movable cell 66 inside a hollow spring cover 96 which is attached to the side of the pivoting cell 66. The upper slide fit pin 98 extends into receiver holes 97 provided in the hollow spring cover 96. The upper pin may be retained in place with another e-ring 100 in a manner similar to that

Exhibit B, Page 37

US 6,353,581 B1

7

described above with regard to the pivot shaft 86. However, in the embodiment illustrated, a single e-ring is used as the e-ring 100 slides into a slot (not shown) integral to the spring cover 96 so that the single e-ring can prevent pin 98 movement in both directions. .

A base pin 102 is similarly attached to the spring 94 via a loop in the lower end of the spring 94. The base pin 102 may rest in notches 104 (or holes) in the base 76 so as to affix the spring 94 to the base 76. The base pin 102 may also be retained in the notches with an e-ring 101 as described above.

The base pin 102 may be mounted to the base 76 at a location selected relative to the pivot axis 78 so that the pivotably movable cell 66 is bi-stable in the closed, upright position and also in the open, pivoted position. In one embodiment, shown in FIG. 7, the notch 104 is positioned slightly downward and rearward relative to the holes 90 which mount the pivot shaft 86. With this placement, the spring 94 becomes maximally extended at a point intermediate to the upright and downwardly pivoted positions. Thus, the spring is extended both as the cell is initially lowered from the upright position, and also when it is initially raised from the lowered position. The cell will therefore be biased to remain in either the downward or upright positions once placed there manually by a user. It may also be advantageous to position the base pin 102 such that the spring bias is stronger when the cell 66 is near the upright position, and is weaker when the cell is pivoted downward and is resting against the top edge 80 of magazine handle 74 as shown in FIG. 6.

To limit access to the mail slot and/or to the entire magazine 58 only to authorized users, the door 62 may be locked closed unless a user inputs an appropriate access code to the library. As is well known to those in the art, such access codes or passwords are typically entered via the keypad 53, although password entry via a host computer system may also be used in some embodiments. Upon entry of the proper code, the door 62 may be released automatically with, for example, an electrically actuated latch release mechanism such as a solenoid attached to the library housing. This provides one level of media security because users of the system may be selectively given the password, and thus only certain users will be able to access the mail slot.

The magazine itself may also be secured inside the enclosure 52 of the library unless released by a user inputting a proper access code to the library which is typically different than the mail slot access code. This may drive a second electrically actuated latch release mechanism such as a second solenoid mounted in the library and coupled to the magazine itself. In the embodiment of FIGS. 3–7, a magazine release solenoid in the library engages a latch 106 (FIG. 7) provided on the base 76 of the mail slot on the magazine 58. When released, the entire magazine 58 may slide out the open door 62. Multi-level security may therefore still be provided, without having a mail slot location which is physically separate from the media element magazine.

While the above detailed description has shown, described, and pointed out novel features of the invention as applied to various embodiments, it will be understood that various omissions, substitutions, and changes in the form and details of the device or process illustrated may be made by those skilled in the art without departing from the spirit of the invention. As is also stated above, it should be noted that the use of particular terminology when describing certain features or aspects of the present invention should not be taken to imply that the terminology is being

8

re-defined herein to be restricted to including any specific characteristics of the features or aspects of the invention with which that terminology is associated. The scope of the invention is indicated by the appended claims and their equivalents rather than by the foregoing description.

What is claimed is:

1. A media element library comprising:
a housing;
a door mounted to said housing; and
a media element magazine comprising (1) a linear array of a plurality of media element storage locations which are fixed with respect to said housing during library operation, and (2) one or more moveable media element storage locations, at least a first one of which is coupled to an end of said linear array so as to be manually movable towards said door, wherein said first moveable media element storage location is positioned relative to said door such that a media element in said first moveable media element storage location is accessible from outside the housing when said door is open.

2. The media element library of claim 1, wherein the media elements are tape cartridges. .

3. The media element library of claim 1, wherein the media elements are optical disks.

4. The media element library of claim 1, wherein the media elements are magnetic disks.

5. The media element library of claim 1, further comprising an electrically actuated latch release mechanism coupled to the door.

6. The media element library of claim 1, further comprising an electrically actuated latch release mechanism coupled to the magazine.

7. The media element library of claim 1, further comprising:
a first electrically actuated latch release mechanism coupled to the door and configured to release said door in response to a first access code input to the library; and
a second electrically actuated latch release mechanism coupled to the magazine and configured to release said magazine in response to a second access code input to the library.

8. The media element library of claim 1, wherein said first moveable storage location is attached to the media element magazine by a pivot shaft which allows the first movable storage location to pivot about an axis.

9. The media element library of claim 1, further comprising a bias element attached to the first movable storage location and to the media element magazine.

10. A media element library comprising:
a housing;
an opening in a portion of said housing;
a linear array of media element cells in fixed position with respect to said housing forming a media element magazine, wherein an end of the magazine is adjacent to said opening; and
a moveable cell coupled to said end of said magazine adjacent to said opening, wherein said movable cell is manually movable towards said opening.

11. The media element library of claim 10, wherein the moveable cell is attached to the media element magazine by a pivot shaft which allows the first cell to pivot about an axis.

12. The media element library of claim 10, further comprising a bias element attached to the moveable cell and the media element magazine.

13. A method of accessing a media element from inside a media element library comprising:

Exhibit B, Page 38

US 6,353,581 B1

9

delivering a media element from a fixed cell to a tiltable cell of a media element magazine;

tilting the cell toward an opening in the media element library and away from other cells in the media element magazine; and

removing the media element from the cell.

**14.** The method of claim **13**, wherein the opening is formed by opening a door.

**15.** A media element library comprising:

a housing having an access opening therein;

a plurality of coupled media element storage locations fixed relative to said housing forming a media element magazine;

a manually movable storage location in said media element magazine adjacent to said access opening;

means for manually moving said movable storage location so as to access a media element directly from said manually moveable storage location adjacent to said opening; and

means for simultaneously restricting access to the fixed storage locations storing other media elements in said media element magazine.

**16.** A media element magazine comprising:

a linear array of media element cells in fixed relative position; and

at least one movable cell coupled to one end of said linear array such that said at least one movable cell is manually movable towards a doorway upon installation in a media element library.

**17.** The media element magazine of claim **16**, wherein the movable cell is attached to the media element magazine by a pivot shaft which allows the at least one movable cell to pivot about an axis.

**18.** The media element magazine of claim **17**, further comprising a bias element attached to the at least one movable cell and the media element magazine.

**19.** A method of making a media element library comprising:

coupling a plurality of media element storage locations so as to form a linear array of media element storage locations which are fixed with respect to one another;

coupling a movable storage location to an end of said linear array such that said movable storage location is manually movable with respect to said end of said linear array; and

positioning said movable storage location relative to an opening in a said media element library such that manual access through said opening to a media element stored in said movable storage location is allowed, and

10

manual access through said opening to at least one media element stored in one or more other media element storage locations is restricted.

**20.** A media element library comprising:

a housing;

a door mounted to said housing;

a plurality of coupled media element storage locations forming a media element magazine, wherein at least a first media element storage location of said media element magazine is movable relative to other media element storage locations and positioned relative to said door such that a media element in said at least a first media element storage location is accessible from outside the housing when said door is open, and wherein at least a second media element storage location of said media element magazine is positioned relative to said door such that a media element in said at least a second media element storage location is inaccessible from outside the housing when said door is open; and

a spring attached to the movable storage location and to the media element magazine, wherein the movable storage location is bi-stable in the closed, upright position and also in the open, pivoted position.

**21.** A media element library comprising:

a housing;

an opening in a portion of said housing;

a plurality of media element cells forming a media element magazine, wherein an end of the magazine is adjacent to said opening;

a moveable cell coupled to said end of said magazine adjacent to said opening; and

a spring attached to the moveable cell and the media element magazine, wherein the moveable cell is bi-stable in the closed, upright position and also in the open, pivoted position.

**22.** A media element magazine comprising:

a plurality of media element cells configured to store media elements;

a movable cell coupled to one end of the media element magazine by a pivot shaft which allows the cell to pivot about an axis; and

a spring attached to the cell and the media element magazine, wherein the movable cell is bi-stable in the closed, upright position and also in the open, pivoted position.

* * * * *

**JS 44** (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| OVERLAND STORAGE, INC. | BDT AG (GERMANY), BDT PRODUCTS, INC., BDT-SOLUTIONS GMBH (GERMANY) |

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Germany
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Sean Cunningham (Bar No. 174931), DLA Piper LLP (US)
401 B Street, Suite 1700, San Diego, CA 92101, (ph) 619-699-2900

Attorneys (If Known)

'10 CV 1700   JLS BLM

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☒ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C. Section 281, 271
Brief description of cause:
Patent Infringement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE  N/A   DOCKET NUMBER

DATE
08/13/2010

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 16911   AMOUNT $350   8/13/10 BM   APPLYING IFP   JUDGE   MAG. JUDGE



```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS016911
Cashier ID: bhartman
Transaction Date: 08/13/2010
Payer Name: DLA PIPER
--------------------------------
CIVIL FILING FEE
 For: OVERLAND STORAGE V BDT AG
 Case/Party: D-CAS-3-10-CV-001700-001
 Amount:      $350.00
--------------------------------
CHECK
 Check/Money Order Num: 592866
 Amt Tendered:  $350.00
--------------------------------
Total Due:     $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```